J-S24017-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.F., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 303 WDA 2024 |

Appeal from the Order Entered February 14, 2024
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s):  CP-02-AP-0000007-2022

BEFORE:   BOWES, J., SULLIVAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY SULLIVAN, J.:                   **FILED: SEPTEMBER 30, 2024**

A.M. ("Father") appeals from the decree[1] involuntarily terminating his parental rights to his daughter, A.F. ("Child" or "the Child"), born in August 2018.[2]  After review, we affirm.

"Child . . . tested positive for THC and cocaine at birth.  The hospital referred the matter to [the Allegheny County Office of Children, Youth and Families ("CYF" or "the Agency")], which opened a case two days later.  Father

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Although the trial court used the term "order," termination of parental rights is accomplished by decree.  ***See*** 23 Pa.C.S.A. § 2513(d).

[2] The court involuntarily terminated the parental rights of Child's mother, A.F. ("Mother") via the same order.  Mother likewise appealed, and we address her appeal by separate memorandum at Superior Court Docket No. 283 WDA 2024.

did not live with Mother and was not yet identified as the Child's father because Mother put forward Father and an alternative potential father." Orphans' Court Opinion, 4/16/24, at 2 (citations to record omitted).

After closing the case in October 2018, the Agency re-opened it in July 2019 and obtained protective custody of Child in January 2020, due to Mother's substance abuse relapse. *See* N.T., 1/12/23, at 16-20. The court confirmed Child's commitment at a shelter care hearing on January 24, 2020; Father appeared at that hearing. A dependency petition was filed in February 2020. The court adjudicated Child dependent as to Mother that month and established a permanency goal of return to parent or guardian. The court continued the adjudication as to Father pending genetic testing, ultimately adjudicating Child dependent as to an unknown father in November 2020. *See id*. at 22, 25-28; Agency Exhibit 1.[3]

The Orphans' Court summarized the testimony and evidence concerning Father's participation in the dependency and involuntary termination proceedings as follows:

> For the first two years of the case, Father did next to nothing. He did attend the Child's shelter hearing in [January] 2020. He even offered himself up as a placement option, but when CYF attempted to schedule a home assessment, Father canceled because of a death in the family and did not get back to CYF for six months.

---

[3] We observe a disparity between some of the exhibit numbers placed on the record and that reflected on the actual documents in the certified record and refer to the exhibits by numbering used in the certified record.

At that shelter hearing in 2020, Father was informed that he was required to undergo a random drug screen and paternity testing[] but did neither. He was scheduled four times for paternity testing, but Father did not get around to it for two years at which time paternity was confirmed.

After that 2020 shelter hearing, Father's communication was sporadic until it ended in November of 2021. He was ordered to participate with a father-engagement specialist, but the specialist had trouble contacting Father.

[Subsequent to his appearance at a review hearing in April 2022, a few days before the originally scheduled May 2022 termination hearing], Father let the CYF caseworker assess his home, which was cluttered but appropriate, and . . . the caseworker also went over his goals. Father was to undergo a drug and alcohol assessment and screen and to complete paperwork necessary for those assessments. Rather than simply do it, Father focused on Mother's drug problem as the source of his difficulties. He did not do a screen or reach out for visits.

[Prior to this time], Father never sought visitation, never sent the Child cards, never sent the Child gifts, never sent the Child financial support, never asked about the Child's well-being, and never asked about her medical or dental care.

Father was called and sent mail notifications regarding family planning meetings[] but did not attend. Father testified that he had health issues, but he never explained to anyone what they were.

* * * * *

The first day of testimony on the present issue of Father's parental rights took place in January of 2023, and just afterward, Father's efforts toward his goals increased. [In April 2023, he engaged with a father[-]engagement specialist and completed a substance abuse evaluation and additional home assessments and began discussions regarding visitation with Child.] However, his late attempts to visit the Child were complicated by Father's difficulty understanding and respecting CYF's rules regarding confirming visits ahead of time [and other logistical difficulties]. . .. Father pointed to medical appointments, work issues, and difficulty walking to the bus and other public transit as the source of the problem. CYF tried offering gas cards to Father and explored having Father's friend act as a supervisor. In

- 3 -

essence, Father's scheduling preferences made for a complex affair.

Months passed before an arrangement was ironed out, and between October 19, 2023, and the final day of testimony on February 8, 2024 [], Father visited three times. Moreover, Father's first visit started late because Father chose to use some of his visit time venting his frustration at what Father saw as CYF placing obstacles in his path.

The visit supervisors described Father's visits as light in nature and with little conversation because Father and the Child were beginning to get to know each other. The Child did not go to Father for comfort or specific needs although she now called him her father.

Over the 13 months leading up to the final hearing, Father again did not send the Child financial support, gifts, cards, or letters. He did not ask about or attend her medical care. He did not ask about her schooling or extracurricular interests or activities.

Father's three eleventh-hour visits were the only ones over the life of the case.

Orphans' Court Opinion, 4/16/24, at 8-11 (record citations omitted).

In January 2022, the Agency filed a petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[4] The court held evidentiary hearings on the Agency's petition in January 2023, and February 2024. Child was represented by KidsVoice.[5]

_____

[4] As Father's paternity had yet to be established at that time, the Agency also sought to terminate the parental rights of an unknown father. Ultimately, the petition was withdrawn as to an unknown father.

[5] Pursuant to *In re Adoption of K.M.G.*, 240 A.3d 1218, 1236 (Pa. 2020), we must verify the court appointed counsel to represent Child, and if counsel served in a dual role, the court determined before appointment that there was

*(Footnote Continued Next Page)*

Father testified he saw Child three times per week before the Agency's involvement in 2018 or 2019, a claim Mother disputed. *See* N.T., 1/12/23, at 132; N.T., 2/8/24, at 237. Father blamed his two-year failure to obtain paternity testing on the coronavirus and unspecified health issues, declaring he was "not one hundred percent in shape," and that "old age is kicking in." *See* N.T., 1/12/23, at 133-35. Father admitted he knew in 2020 that if he submitted to a drug screen and an evaluation of his home, Child could potentially have come live with him; he faulted the Agency for not following up with him, and declared a drug screen would not be "fair" to him. *See id*.

---

no conflict between the child's best and legal interests. For children too young to express a preference, there is no conflict between the child's legal and best interests, and the child's right to counsel is satisfied by the appointment of an attorney-guardian *ad litem* ("GAL"). *See In re T.S.,* 192 A.3d 1080, 1092-93 (Pa. 2018).

Here, in March 2022, the Orphans' Court appointed KidsVoice, which had served as Child's guardian *ad litem* ("GAL") during the dependency proceedings, to represent Child's legal interests in accord with 23 Pa.C.S.A. § 2313(a). *See* Order Appointing Legal Counsel, 3/7/22. The court also found, prior to testimony, that because Child was then three years old there was "no divergence between her legal and her best interests." *See* N.T., 3/7/22, at 11. KidsVoice served as legal counsel and GAL throughout the hearing. *See* N.T., 2/8/24, at 221-223. We discern no structural error in the dual representation. *See In re T.S.*, 192 A.3d at 1092-93. KidsVoice subsequently filed a brief in this Court supporting the termination of Father's parental rights.

at 136-40.[6] Father blamed his failure to visit Child on the Agency.[7] *See id*. at 140-41. Father stated he would now be willing to have a drug and alcohol screen but wondered if he was "being set up to where I am going to have to go through expectational swings like you're putting [Mother] through. . .." *See id*. at 142.

At the February 2024 hearing, Dr. Eric Bernstein, an expert in child psychology and forensic psychology, testified he conducted an interactional evaluation in December 2023 of Child and Foster Parents, and described the relationship as "healthy and secure," permitting child to look to them for her needs. *See* N.T., 2/8/24, at 21, 54. Importantly, Dr. Bernstein observed a reciprocal connection from Child to foster parents. *See id*.

Dr. Bernstein, who did not perform a father-child bonding analysis, testified Father claimed in January 2024, that Child knew him "quite well." The doctor later learned Father had visited Child three or four times in the previous three to four years, *see* N.T., 2/8/24, at 23-24, 29, raised questions in the doctor's mind about the extent of any bond between them, *see id*. at

---

[6] Concerning drug testing, Father stated, "[I] refuse to go through an obstacle just where [Mother] has to because of her circumstances, I don't feel it is fair for me to have to go through it." *See* N.T., 1/12/23, at 139.

[7] When asked about visits with Child, Father stated, "I haven't been given that chance. I haven't even been really not even in my home given that people were going on principle to not even [let that] happen . . .. I didn't get that because it never took place. I was never given that chance." *See* N.T., 1/12/23, at 140-41.

49.[8]  Dr. Bernstein found Father "notably guarded" and unwilling to provide information which would present him in a less than positive light.  *See id*. at 30.[9]  He also observed that Father's accounts of his legal history differed from facts received through other sources.  *See id*. at 36.

Agency caseworker, Myia Weisend ("Ms. Weisend"),[10] testified Father participated in a family plan meeting in January 2024, and had completed a housing assessment, a drug and alcohol assessment, and a session with a father-engagement specialist after two prior failures to do so.  *See id*. at 68-70, 91, 101.  She stated that Father did not participate with the Agency until May 2023, and thereafter failed to comply with visitation procedures on five consecutive occasions, and later failed to attend visits that did not satisfy his desired scheduling.  *See id*. at 72-76, 92.  In October 2023, Father was found

_____

[8] Dr. Bernstein testified that the lack of consistent contact between a parent and child with a bond was the "the equivalent of pulling a scab that constantly creates pain," and if parent and child had a limited bond or no bond, that absence would at a minimum disrupt the Child's daily routine.  *See* N.T., 2/8/24, at 52-23 (Dr. Bernstein's testimony); *id*. at 240-41 (Orphans' Court's summary of Dr. Bernstein's testimony about the detrimental effects of periods of prolonged or unexplained absence on a parent's bond with a child).

[9] Dr. Bernstein's diagnostic impressions were that Father had an adjustment disorder with depressive mood.  *See id*. at 32.  Dr. Bernstein also thought Father's overly suspicious behavior merited evaluation.  *See id*. at 33.

[10] Ms. Weisend was the assigned caseworker for this matter from December 2019 until August 2022, and following educational leave, resumed her duties in January 2024.  Notwithstanding, she confirmed that she "stay[ed] abreast of the case" while on leave.  *See* N.T., 1/12/23, at 9; N.T., 2/8/24, at 62, 69, 65.

to have made minimal progress in alleviating the circumstances that brought Child into care; he only participated in a home assessment in the later part of 2023. *See id*. at 102, 159-60. Father visited Child once per month in December 2023, and January and February 2024, but took forty-five minutes from one of those visits to complain about the Agency. *See id*. at 78, 138-39, 149. Ms. Weisend stated that over the thirteen months preceding February 2024, Father had not sent any gift, cards, letters, or financial support for Child or participated in any aspect of her medical care or education. *See id*. at 79. During that time, Father, who had never been responsible for Child's care, took no actions to remedy the conditions that caused him to be incapable of caring from Child. *See id*. at 80-82. Ms. Weisend opined termination of Father's parental rights would give Child the desired permanency she sought and an enhanced sense of family in her pre-adoptive home, *see id*. at 83-84; Bill Bedillion, the Agency casework supervisor, agreed that termination would be in Child's best interests. *See id*. at 162.

Father testified he worked with a father-engagement specialist since the summer of 2023, but continued to have issues with the Agency. *See id*. at 185-87. Father was critical of the Agency's arrangement of visits:

> Well, when I'm just being thrown days and that, at first the whole thing was set up, well, we both work, and it went from that to a demanding of days that were thrown at me that I was supposed to participate on when *I had other things going on*.

*See id*. at 190 (emphasis added). He also faulted the Agency for "negligence." *See id*. at 191. Concerning the January 2024 family plan the month before,

Father stated, "There's so many meetings and so many this and that that is being thrown at us. It's hard to even identify what particular [sic] with so many, so much of what's going on **when you got your own life going on, too**. It's a lot to collect. I can't identify what particular because we discussed so much." **See id**. at 193 (emphasis added).

Foster father described Child's attendance at trauma therapy and play therapy and described her IEP. He expressed his and his wife's desire to adopt Child and openness to continuing visitation for parents. **See id**. at 197-205.

At the conclusion of the hearing, the Orphans' Court found Father had not paid attention to Child until she was four years old, missed four scheduled appointments for paternity testing, had very sporadic contact with the Agency, did not speak to the Agency between May 2020 and November 2021, did not attend a family plan meeting until January 2024, refused for multiple years to allow a home assessment, did not visit Child or seek information about her development or provide any cards, gifts, or financial support, blamed unelaborated health conditions and Agency negligence for his limited communication with the Agency, showed no concern for Child's perspective when he met her in April 2022, after a prolonged absence and demanded to be greeted as a father, had seen Child only three or four times in the past three or four years, and had not been able to provide a safe life for Child. **See id**. at 225, 229-44.

By order dated February 8, 2024, and entered February 14, 2024, the trial court involuntarily terminated Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(2), (8), and (b). Father filed a timely notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed a responsive Rule 1925(a) opinion.

On appeal, Father raises the following issues for our review:

1. Did the [Orphans' Court] abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(2) and (8)?

2. Did the [Orphans' Court] abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S.[A.] § 2511(b)?

Father's Brief at 4 (suggested answers omitted).[11]

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the [Orphans' Court's] findings of fact and credibility determinations if they are supported by the record. Where the

---

[11] Although stated rather baldly, Father's challenge to the sufficiency of the evidence regarding grounds for termination under Section 2511(a) and (b) did not preclude the trial court's review and we decline to find waiver. **See In re J.W.**, 578 A.2d 952, 956 (Pa. Super. 1990) (declining to find waiver on procedural grounds where issue was raised and considered in trial court and it is in the best interests of the child to reach the merits of the claim).

[Orphans' Court's] factual findings are supported by the evidence, an appellate court may not disturb the [Orphans' Court's] ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to [Orphans' Courts], who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, [the Orphans' Court] must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

**Interest of M.E.**, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted; capitalization standardized).

Section 2511 of the Adoption Act ("the Act") governs the involuntary termination of parental rights. **See** 23 Pa.C.S.A. § 2511. Under the Act, the trial court must first determine whether the parent's conduct warrants termination under one of the grounds set forth at section 2511(a). Only if the court determines that the petitioner has established grounds for termination under Section 2511(a) does it engage in assessing the petition under Section 2511(b), which focuses upon the child's needs and welfare. **See In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013). To involuntarily terminate parental rights, the

petitioner must satisfy both section 2511(a) and (b) by clear and convincing evidence. *See In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021).

In this case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (8), and (b). To affirm the underlying decrees, we need only agree with the court's decision as to any one subsection of section 2511(a), in addition to section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). As such, we limit our discussion to section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for [her] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * * * *
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(a)(2), (b).

To prove the applicability of subsection (a)(2), the party petitioning for termination must establish: (1) repeated and continued incapacity, abuse,

neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) the causes of the incapacity, abuse, neglect or refusal cannot and will not be remedied. *See* 23 Pa.C.S.A. § 2511(a)(2); *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Subsection (a)(2) emphasizes the child's present and future need for essential parental care, control, or subsistence, not the parent's refusal to perform their duties. Thus, the statute "should not be read to compel courts to ignore a child's need for a stable home and strong continuous parental ties. . . . *This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.*" *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted) (emphasis in original). Section 2511(a)(2) is not limited to affirmative misconduct; it may be implicated by acts of refusal or incapacity to perform parental duties. *See In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021), *abrogated on other grounds by Interest of K.T.*, 296 A.3d 1085, 1110 n.23 (Pa. 2023). We have long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See In re M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017).

Father asserts that, despite obstacles,[12] he met his goals and made progress, particularly after ultimately commencing work with the father-engagement specialist. *See* Father's Brief at 14-23. While acknowledging "miscommunication and misunderstanding" related to visitation, Father contends that, visitation was going well, and any issues related to logistics should not be an impediment to reunification. *See id*. at 19-21.

In finding the Agency established the statutory grounds to terminate Father's parental rights pursuant to section 2511(a)(2), the court reasoned:

> [Father] made faint efforts to engage with CYF, pursue his goals, and interact with [the] Child except on the eve of critical court proceedings. . ..

> * * * * *

> At the shelter hearing, he was required to undergo paternity testing. He took two years to do it. He was ordered to work with a father-engagement specialist, but then the provider had difficulty contacting Father – a recurring theme with Father and his services. Father dilly-dallied with paperwork necessary for basic assessments, resentfully saying that the case was about Mother's drug problems.

> Father's primary contact with the Child was in court. In 2022, he inappropriately told the Child to give her "dad" a hug, failing to consider what impact that might have on a little girl who did not know him. He only managed to visit [the] Child three times before his final court hearing on February 8, 2024. . .. Father's priority was complaining about Mother and CYF's failure to bend visitation to his complex requirements.

---

[12] Father raises his age, unspecified health issues, the COVID-19 pandemic, and his own past experience with child welfare agencies as a child as obstacles which impaired his ability to complete his reunification goals. *See* Father's Brief at 15-24.

- 14 -

Father was not even diligent in his excuses. He was so vague about his own life, work issues, and health challenges that Dr. Bernstein finally opined that Father should undergo a mental-health evaluation because his guardedness in disclosing any information was . . . disproportionate.

Father claimed that CYF put "obstacles" in his path, but if that were true, Father was required to "exercise reasonable firmness in resisting obstacles" between him and [the] Child. He never offered a reason why he could not offer the Child financial support or just call her, send her a card, or give her a birthday gift – ever – during all the years in which she was struggling to settle into foster care. In hearing after hearing, this [c]ourt found no progress by Father. Despite this, he ended his testimony with the proclamation that he would take any steps necessary to be reunified with his daughter despite years of failing to do just that.

This [c]ourt found Father distinctly lacking in credibility. Father abandoned the Child. He was a ghost in her life – an individual who appeared in a courtroom calling himself "dad" only to then vanish again because he was disgruntled with the hassles – perceived or real – of setting up visits. Plainly, he either cannot or will not remedy these conditions. . ..

Father's contention is baseless.

*Id.* at 21-22.

We discern no abuse of discretion by the trial court in concluding that termination pursuant to section 2511(a)(2) is warranted because Father's repeated and continued neglect and refusal has caused Child to be without essential parental control or subsistence necessary for her physical and mental well-being, and Father cannot or will not remedy this situation. *See A.H.*, 247 A.3d at 443. Father failed for more than two years to establish paternity or even allow for his home to be assessed, simple steps that might have allowed Child to live with him from 2020 onward. *See* N.T., 1/12/23, at 15,

22-24, 27-28, 57-58, 104-05, 114-15, 118; Agency Exhibit 1. Father did not visit Child between the January 2020 shelter care hearing and an April 2022 review hearing, and thereafter visited her only three times. **See** N.T., 1/12/23, at 60-61; N.T., 2/8/24, at 61, 72-75, 77, 80, 92, 97-99, 102, 108, 120, 127-132. Father made almost no progress with his goals until October 2023, when the court found him to be in moderate compliance, although still noting minimal progress. **See** N.T., 2/8/24, at 96, 102; Agency Exhibits 10, 18. Father never attended a family plan meeting until January 2024, claiming unspecified "health conditions." **See** N.T., 2/8/24, at 33, 110-12.

Child had been placed over four years at the time of the conclusion of the subject proceedings and is entitled to permanency. A parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. **See M.A.B.**, 166 A.3d at 443. "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." **In re Adoption of R.J.S.**, 901 A.2d 502, 513 (Pa. Super. 2006). Father's first claim does not merit relief.

Having found sufficient grounds for termination pursuant to section 2511(a)(2), we must next determine whether termination was proper under section 2511(b). Section 2511(b) affords "primary consideration to the

developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Our Supreme Court has generally outlined this inquiry, as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*K.T.*, 296 A.3d at 1105-06 (internal citations, quotation marks, and footnotes omitted).

"In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted). Moreover, when evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *Z.P.*, 994

A.2d at 1121 (internal citations omitted). It is within the Orphans' Court's province to consider the totality of the circumstances when performing a needs and welfare analysis. *See M.E.*, 283 A.3d at 839. An Orphans' Court has the discretion to prioritize the safety and security of a child over her bonds with her parent and we will not disturb such an assessment if supported by the record. *See id*.

Father asserts he had a very positive relationship with Child, and foster father testified Child looked forward to their visits and called him "Dad." *See* Father's Brief at 25-28.

In concluding that Child's developmental, physical and emotional needs and welfare supported termination of Father's parental rights, the Orphans' Court stated:

> This [c]ourt found that termination of [Father's parental] rights would not destroy a necessary or beneficial relationship. . . . Father never had a bond with [] Child, and all he could do is disrupt the fortunate situation in which she now finds herself.
>
> Under these circumstances, this [c]ourt can only conclude that the Child would not suffer a serious detriment from termination of the parent['s] rights.
>
> ***This Child, who is in her third placement, was at risk of foster care drift, and she even expressed to the caseworker her desire for a family. What would be detrimental would be to leave her in limbo, while Mother and Father continue with goals toward which they have made no significant progress and of which they exhibit no understanding.***

Orphans' Court Opinion, 4/16/24, at 28 (emphasis added).

We discern no error in the Orphans' Court's determination. Father had no involvement with Child prior to removal and saw Child at the January 2020 shelter care hearing and not again for more than two years at an April 2022 review hearing.[13] *See* N.T., 1/12/23, at 22, 60-61; N.T., 2/8/24, at 82, 97-99. Thereafter, Father participated in only three visits from December 2023 until the second evidentiary hearing in February 2024. *See* N.T., 2/8/24, at 29, 77, 127, 132, 188, 203. Throughout, Father did not send Child any letters, cards, gifts, or money. Nor did he inquire regarding Child's well-being. *See* N.T., 1/12/23, at 62, 65; N.T., 2/8/24, at 79. Although Father's recent visitations with Child were positive, testimony at the hearing established their conversation was "light" and "very surface level." *See* N.T. 2/8/24, at 127-135, 138, 149, 208. Further, Child did not approach Father for comfort or any specific needs. *See id*. at 127-129, 133.

Dr. Bernstein opined there was no evidence of a healthy or secure bond between Child and Father. *See id*. at 54-55. He testified the approximately four encounters Father had with Child in four years raised questions about the extent of any bond and how Child would be impacted if that contact ceased.

---

[13] As to Father's interaction with Child at the April 2022 review hearing, Ms. Weisend observed, ". . . I wouldn't say [it] was necessarily positive at first[,] as Father engaged [Child] saying[,] 'Come here, [Child]. Give daddy a hug,' and she responded saying[,] 'You're not my dad.'" N.T., 2/8/24, at 99; *see* N.T., 1/12/23, at 60-61.

*See id.* at 23-24, 49. Dr. Bernstein further explained the disruptive quality of such occasional meetings on the Child:

> So[,] it just essentially forces you to start back at the starting line. So[,] every time that there's a level of inconsistency, assuming that there is no bond and you're trying to establish one, it just creates further huddles to jump over for that to essentially crystalize into a more meaningful connection.

*See id*. at 53-54.

In contrast, Child has formed a loving, safe, stable, and supportive bond with her current pre-adoptive foster parents ("Foster Parents"), with whom she had been placed approximately eight months at the time of the conclusion of the subject proceedings and who provide for all her needs, including her special needs including ADHD, for which she received and was engaged in services, both in school and otherwise, and has individualized educational plan ("IEP") that addresses her behavioral needs. *See id*. at 21, 81, 103-05, 123-24, 160-61, 198, 204. Foster Parents are involved in this care and participate in it. *See id*. at 103-105, 200-202. Foster Father also reported mutual affection between Child and himself and his wife, whom Child refers to as mom and dad. *See id*. at 202-203. Child has made significant progress with these interventions. *See id*. at 161.

Dr. Bernstein and Mr. Bedillion testified Foster Parents were meeting Child's needs and welfare. *See id*. at 21-22, 160-161. Ms. Weisend testified that the termination of Father's parental rights would serve Child's needs and welfare by giving her permanency, stability and a sense of home and family,

which Child had expressed a recent wish to have. *See id*. at 82. Mr. Bedillion express a similar opinion, *see id*. at 151, and Dr. Bernstein stated he viewed Foster Parents as a healthy and stable permanency resource for adoption. *See id*. at 34-35. Accordingly, the record corroborates the Orphans' Court's determination termination of Father's parental rights would not sever a necessary and beneficial relationship and would best serve Child's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b). *See K.T.*, 296 A.3d at 1113. As such, we discern no abuse of discretion and do not disturb the order involuntarily terminating Father's parental rights.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 09/30/2024